**J.A. LaPORTE, INC., Plaintiff,**

v.

**NORFOLK DREDGING COMPANY, Defendant.**

Civ. A. No. 83–694–N.

United States District Court,
E.D. Virginia,
Norfolk Division.

July 11, 1985.

John T. Roberts, Roberts & Floyd, Washington, D.C., and James C. Howell, Willcox & Savage, P.C., Norfolk, Va., for J.A. LaPorte, Inc.

Robert A. Vanderhye, Cushman, Darby & Cushman, Washington, D.C., and Francis N. Crenshaw, Crenshaw, Ware & Johnson, Norfolk, Va., for Norfolk Dredging Co.

## MEMORANDUM OPINION

MacKENZIE, Chief Judge.

### Background

This is an action for patent infringement under the patent laws of the United States, Title 35, United States Code. The patent in suit, No. 4,373,277, of a "Cutter Extension Cone", was issued to Edward Cucheran, the named inventor, as patentee. Plaintiff dredging company, J.A. LaPorte, Inc., is the assignee of rights under the patent in several Southeastern States. LaPorte complains that defendant Norfolk Dredging Company has infringed upon the patent. The matter was tried by the Court on the liability issue only.

### Findings of Fact

1. J.A. LaPorte, Inc., plaintiff (LaPorte), operates a commercial dredging

business along the central East Coast of the United States. John J. MacDonald (MacDonald), is the president of LaPorte and has been the dominating operator thereof for many years.

2. Norfolk Dredging Company, defendant (Norfolk), also operates a commercial dredging business, primarily in Virginia, North Carolina, South Carolina, Georgia and Florida.

3. Robert Jantzen (Jantzen) is a consulting engineer to the dredging industry and is president and operator of Jantzen Engineering Company.

4. In 1977, Sceptre Dredging Company (Sceptre), a Canadian concern, was engaged in a channel maintenance contract in the St. Lawrence River System, at Lake St. Pierre in Canada. The engineer in charge and vice-president of Sceptre was Edward Cucheran (Cucheran). Cucheran there described a device which could be attached to the rear of the cutter blades of a hydraulic dredge whose purpose it was to move dredged material forward to the suction pipes of the dredge and thus to allow the dredge to move ahead faster. The Cucheran device was not for "original digging" but would aid in the removal of material that had either silted in or had been cut by the dredge cutter itself. The original Cucheran device had been sketched on scrap paper. Cucheran discussed it with his consulting engineer, Jantzen. A prototype was constructed in 1977 by Fabspec, a Canadian fabricating firm, and was used on a dredge operated by Sceptre in 1977. A similar device was also used by Sceptre in the Welland Canal in 1978 and in the Magdalen Islands in the St. Lawrence River.

5. Jantzen photographed this Cucheran cutter cone prototype in Canada, sometime in 1978, and in turn gave one of the pictures to MacDonald, President of LaPorte, in 1979.

6. About November 4, 1980 MacDonald, president of LaPorte, contacted Jantzen and ordered the cone for LaPorte's use.

7. LaPorte sent a cutter from its South Carolina depot to Jantzen in Baltimore in order for him to fit the Cucheran cone on an actual cutter in use by LaPorte.

8. The cone was constructed by Ackerman and Baynes Inc., steel fabricators in Baltimore, from Jantzen's photograph of the original cone designed by Cucheran. Construction began before November 25, 1980, the date Ackerman and Baynes opened their ledger sheet on the job.

9. The purchase arrangement between LaPorte and Jantzen for the construction of the Cucheran cone occurred in November, 1980, and was on a cost plus percentage basis.

10. In the spring of 1981 MacDonald of LaPorte raised the question with Jantzen of whether the Cucheran cone was patentable. At that time Jantzen took a negative attitude since the cone had been in use in Canada in 1977. Nevertheless, a patent was pursued. Costs for patent counsel and engineering drawings were paid by Jantzen and LaPorte.

11. In 1982 a patent examiner originally turned down the patent on the basis of prior art but later approved the patent and it was issued.

12. The photograph of the Cucheran cone taken in Canada in 1978 was taken in Cucheran's presence, with his permission, and with no directions from him as to confidentiality. The same photograph, or a copy, in addition to being shown to MacDonald of LaPorte in 1979, was also given to Charles Baynes of Ackerman and Baynes Inc. of Baltimore, and no request for confidentiality was made to either MacDonald or Baynes. As a matter of fact, photographs (Exhibits 4 and 5) of the Cucheran Cone were made by Ackerman and Baynes in Baltimore and, again, no question of confidentiality in their exhibition was ever raised by anyone.

13. Cucheran was never asked about the patenting of the device he had built in 1977 until MacDonald and Jantzen made such a request to him in 1981.

14. In November, 1982, Russell Thorne, Executive Vice-President of Norfolk Dredging Company, hired Charles Gillikin,

a consultant, to make suggestions to improve the production run, *i.e.*, cubic yards of dredged material per hour, of the Norfolk dredge PULLEN.

15. Thorne had already heard in the trade of increases in production for a hydraulic dredge operated by LaPorte using a "big cone". Gillikin, the consultant, recommended the construction of a cutter cone for the PULLEN. Such a cutter cone was immediately built for Norfolk Dredging at Georgetown, South Carolina under Gillikin's direction and within two weeks of order the cone was installed and operating to vastly increase the PULLEN'S cubic yards per hour.

16. Within a period of sixty days, November 3, 1982 to January 3, 1983, Norfolk Dredging had four additional cutter cones constructed. All construction was supervised by Gillikin.

17. This was the same Charles Gillikin who, as dredging supervisor for J.A. LaPorte, Inc., had seen the photographs of the Cucheran cone and had received the Jantzen built cutter cone for LaPorte in Charleston Harbor in January, 1981. He had successfully used it on the LaPorte dredge, CLARENDON, where volume was dramatically increased. This cutter cone was admittedly the Cucheran invention.

18. Nowhere in the testimony of Thorne, Vice-President of Norfolk Dredging, is any effort made to suggest the cutter cones constructed and used by Norfolk Dredging were anything but the Cucheran invention.

19. Thorne, in March, 1983, wrote to a respected engineer in the dredging industry, John Huston, seeking his advice (Exhibit 59) that the cutter cone was ". . . not something new". The actual inquiry was ". . . to see if [Huston] could provide any information that would help support my theory that this [the Cucheran invention] wasn't anything new". Vol. I, page 156. Unfortunately, Mr. Huston's reply (Exhibit 71), was of no aid to Norfolk Dredging.

20. In stipulations in the Final Pretrial Order, Norfolk Dredging agreed that it obtained no opinion of outside counsel concerning their liability under the Cucheran Patent prior to its use of the cutter cone.

*Conclusions*

Were it not for the fact that we conclude that the Cucheran patent in this case was improperly granted and thus invalid, we would have no problem concluding that the cutter cones made and used by the defendant, Norfolk Dredging Company, did indeed infringe upon the Cucheran invention. The abbreviated findings in paragraphs 14 through 20 above, support infringement to the end that if, upon appellate review, it is determined that the patent is valid, then the appellate court may find infringement and remand this matter on damages, without requiring a new trial on liability.

We conclude that the Cucheran Patent No. 4,373,277 was invalid for two reasons which we comment upon.

I

The plaintiff J.A. LaPorte, Inc.'s order for the cutter cone in November 1980 shows that the invention was "on sale" more than one year prior to Cucheran's application for a patent on December 7, 1981. Jantzen, an engineer in the dredging field, had exhibited his 1978 photograph of the Cucheran cutter cone invention to LaPorte's President, John MacDonald, and had urged him to use it. It is stipulated that the patent in suit was applied for on December 7, *1981*. A statutory critical date, therefore, is December 7, *1980*. The evidence is unassailable that MacDonald, as President of LaPorte, ordered the Cucheran cone in November, 1980. He shipped a dredge cutter from South Carolina to Baltimore in November, 1980, to which the cone was to be attached. Jantzen, the engineer, was to oversee its proper construction. Ackerman and Baynes Inc., the machine shop in Baltimore which built the cutter cone, began work prior to November 25, 1980. The time and material ledger sheet at Ackerman and Baynes Inc. was opened

with a November 25, 1980 entry. All of this was *before* the critical date of December 7, *1980*. Under the patent law the invention was "on sale" under the terms of 35 U.S.C. § 102(b), more than one year prior to the patent application. The patent is therefore void under the express statutory language of 35 U.S.C. § 102(b) which provides that a person shall be entitled to a patent unless:

> "The invention was ... on sale in this country more than one year prior to the date of the application for a patent in the United States."

To refute what was obviously a sale, plaintiff argues that the purchase in November, 1980 was just "experimentation" and not a commercial sale of the invention. We disagree. Jantzen, the engineer, is a longtime personal and business friend of John MacDonald, president of plaintiff, J.A. LaPorte, Inc., a closely held family corporation. MacDonald dominated LaPorte's operation. The two met at least four or five times per month. LaPorte was Jantzen's first and most important client. Jantzen early on had given MacDonald a picture of the Cucheran invention which showed the cutter cone in every necessary detail. (See Appendix 1 and 2.) * Jantzen knew of and had told MacDonald about two dredging operations on which the invention had been used and that it had been very successful. Cucheran had told Jantzen that the "walking distance" of the dredging action of the dredge GENERAL BROCK (an accepted measure of efficiency) had been *doubled*. Most importantly, MacDonald of LaPorte accepted Jantzen's word that the invention had been successfully used.

This Court is absolutely at ease in concluding that the LaPorte order for the Cucheran cutter cone was in no way an "experimental" action for the purpose of perfecting the invention, but was indeed a commercial venture which it hurried to completion and immediately put to work to improve its Charleston dredging operation. An example of plaintiff's strained use of the term "experimental" finds illustration in its own brief wherein plaintiff LaPorte characterizes its entire Charleston Harbor dredging operation, a multi-million dollar project, to be "... to some degree 'experimental'."

In *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831 (Fed.Cir.1984), the Federal Circuit Court of Appeals reiterated its adherence to the three-requirement standard for determining whether an invention was "on sale" under 35 U.S.C. § 102(b), as set forth in *Timely Products Corporation v. Arron*, 523 F.2d 288 (2d Cir.1975), which was:

> (1) that the invention was embodied in the machine offered for sale;
>
> (2) that the invention was reduced to practice and operable [before November, 1980]; and
>
> (3) that the invention was on sale for profit and not for experimentation.

We find under the *Timely Products* tests above:

> (1) that the Cucheran invention was fully embodied in the cutter cone constructed by Cucheran in 1977; that the sale in November 1980 was made from an actual photograph of that embodiment, in which all necessary details of this very simple device were fully disclosed. It is indicative of the weakness of the plaintiff's position that it argues that its addition of small triangular braces to support the helical blades represented a substantive change. In the words of the inventor, Mr. Cucheran, the *de minimus* affect of the addition of small braces was illustrated by his statement that if one took away the helical blades and left only the small triangular supports on the cone, it would be totally ineffective and showed that the supports added nothing to the invention, performing only a stiffening action;
>
> (2) that the Cucheran patent was fully operable before the sale in November,

*Editor's Note:* The Appendices have been omitted for purposes of publication.

1980. It had been in operation since 1977. It had been successfully utilized on two occasions before November, 1980. Thus, it had been tested sufficiently to verify that it was commercially marketable; and

(3) that the cutter cone was on sale for profit in the transaction with LaPorte in November, 1980, and in no wise was such sale experimental. It is agreed that Jantzen made at least fifteen percent profit over the cost of the components and assembly labor. Reference is made to the holding in *General Electric Co. v. United States*, 654 F.2d 55, 59 (Ct.Cl. 1981), wherein the CEC profit of 20–25 percent over costs of material and labor indicated to that court that the product was priced for sale and sold in a competitive market.

Through all of this trial the close relationship of Jantzen, the engineer and expert witness for the plaintiff, and John MacDonald, the operating force of plaintiff, J.A. LaPorte, was always very evident. The actions and exchanges between them before December 7, 1980, were, to a degree, unguarded because at that time Cucheran had made no move for a patent. This "unprotected" period tightened up considerably between November, 1980 and early 1981, when MacDonald began pushing Jantzen to get Cucheran to seek a patent (with LaPorte's backing, financially and professionally). This push to a patent included LaPorte and Jantzen in the profit picture of the patent. Mr. Jantzen balked at trial at revealing his interest but at the Court's insistence agreed that he owns one-third of the patent. LaPorte has a franchise for its use in the Southeastern States.

This Court therefore concludes that the supportive assertions made at trial, each in favor of the other, and their efforts to make the November, 1980 sale into something else (for instance, an experiment) is clouded with their obvious self-interest, and their credibility was seriously affected thereby.

---

## II

While not as predominating or forceful as the patent invalidity based on the "on sale" picture discussed in Part I, the patent in question here is also invalid since it was described in a printed publication more than one year prior to December 7, 1981, the application date for the patent. Under the patent law the invention was "described in a printed publication" under the terms of 35 U.S.C. § 102(b), and is thus invalid. Section 102(b) provides that a person shall be entitled to a patent, presumed valid, unless "(b) ... the invention was ... described in a printed publication in this or a foreign country, ... more than one year prior to the date of the application for patent, ...".

Inventor Cucheran had his cutter cone fabricated from a crude sketch that he made on the back of a cardboard cigarette box in 1977. A photograph of the cone was taken by Jantzen in 1978, in the presence of Cucheran and without any objection from him, several months after its successful operation by Sceptre in Canada. A print of this photograph was given to MacDonald, president of LaPorte, with no requirement of confidentiality. MacDonald, in turn, showed the photograph to at least three other people in the LaPorte organization, again with no requirement or admonishment that it be held in secret.

Jantzen was with Cucheran in Canada in 1977 and knew of the success of the cutter cone. Thereafter, Jantzen suggested to MacDonald that LaPorte attempt to utilize the cutter cone device, especially in light of its successful history in Canada.

Jantzen testified at trial that he took at least two photographs of the Cucheran cone and that at least two pictures thereof were circulating. One was given to MacDonald, as discussed above, and the other was given to Ackerman and Baynes Inc. which had used it to construct the cone for Jantzen. These photographs were freely distributed with no order of secrecy.

Utilizing the photograph almost totally, and with only a rough sketch on a scratch

pad indicating dimensions, Ackerman and Baynes successfully constructed the cone for Jantzen with no difficulty and in a short period of time. It was not necessary to contact the inventor to complete this construction. The fabrication was done from the photograph.

Law on the subject of whether a photograph is a "printed publication" is scant. The prevailing case on point, *Universal Athletic Sales v. American Gym, Etc.*, 546 F.2d 530 (3rd Cir.1976), offers credence to our decision that the photographs were "printed publications" under the statute. The *Universal* Court held that while "neither this Court nor apparently any other tribunal has yet determined whether a photograph itself constitutes a 'printed publication' we believe that a photograph may so qualify for purposes of section 102." *Id.* at 543. *Universal* noted that other courts held that a drawing alone, unaccompanied by a verbal description, may constitute a printed publication. *See, e.g. Des Rosiers v. Ford Motor Co.*, 143 F.2d 907, 911–912 (1st Cir.1944); *In re Bager*, 47 F.2d 951, 953 (C.C.P.A.1931). The Third Circuit concluded in *Universal* that a photograph may anticipate a patent and thus render it invalid when "with a photograph, one conversant in the pertinent art could make or construct a purported invention without resorting either to the patent or to his own inventive skills." *Universal, supra,* at 543. In the case at bar, the photograph exhibits the invention in detail sufficient to allow the construction of the invention by one conversant in the art, in this case, Anderson and Baynes Inc., which proves the point.

In qualifying the Cucheran cone photographs as printed publication we also conclude that the publication was in the hands of the "public" prior to the critical date of December 7, 1980. The "public" has been defined as "that class of persons concerned with the art to which the document relates and thus most likely to avail themselves of its contents." *The Garrett Corporation v. United States*, 422 F.2d 874, 878 (Ct.Cl. 1970). The unrestricted availability of the Cucheran photographs, to at least three different commercial entities prior to December 1980, satisfies the requirement that the publication be disseminated to the "public". *Id.* at 878.

To qualify as a printed publication, the Cucheran photographs must contain enough information to enable a person of ordinary skill in the art to practice the invention without undue experimentation. *International Glass Company v. United States*, 408 F.2d 395, 404 (Ct.Cl.1969). The evidence before us shows that the Cucheran cone was easily reduced to further practice from the photograph of a prototype.

Because the Cucheran patent was described in a printed publication, over a year prior to the application for the patent, it is invalid.

An Order will be entered, contemporaneously with this Memorandum Opinion, finding for the defendant Norfolk Dredging Company.