**J.A. LaPORTE, INC., Appellant,**

v.

**NORFOLK DREDGING COMPANY, Appellee.**

**Appeal No. 85–2773.**

United States Court of Appeals, Federal Circuit.

April 16, 1986.

John T. Roberts, Roberts & Floyd, Washington, D.C., for appellant. With him on brief were W. Brown Morton, Jr., Warsaw, Va. and James C. Howell, Willcox & Savage, P.C., Norfolk, Va.

Robert A. Vanderhye, Nixon & Vanderhye, P.C., Arlington, Va., for appellee. With him on brief was Francis N. Crenshaw, Crenshaw, Ware & Johnson, Norfolk, Va.

Before FRIEDMAN, NIES and ARCHER, Circuit Judges.

NIES, Circuit Judge.

The determinative issue in this appeal is whether activities of a third party created an on-sale bar which invalidated the asserted claims of the patent in suit, No. 4,373,277. The application for the patent in suit for a "Cutter Extension Cone" was filed on December 7, 1981, and issued to Edward Cucheran. Rights in the patent have been granted to appellant, J.A. LaPorte, Inc. LaPorte sued Norfolk Dredging Company for infringement in the United States District Court for the Eastern District of Virginia (McKenzie C.J.).[1] Norfolk challenged the validity of the Cucheran patent on two grounds under 35 U.S.C. § 102(b), which provides for a loss of right to a patent where the claimed invention is in public use or on sale in this country more than one year prior to the filing date of the United States application.[2] The district court here

---

**1.** *J.A. LaPorte, Inc. v. Norfolk Dredging Co.,* 625 F.Supp. 36, 227 USPQ 382 (E.D.Va.1985).

**2.** 35 U.S.C. § 102(b) provides:

held that the Cucheran invention was both in public use and on sale prior to the critical date of December 7, 1980. We agree that the invention was on sale within the meaning of the statute and, accordingly, affirm the judgment.

## Background

The claimed invention [3] is directed to hydraulic dredges of the type used to remove material from the bottom of river channels. These dredges use a cutter head to break up the mud and rock at the bottom of the river. The cutter head is a generally cone-shaped arrangement of helical blades. The helical shape of the turning blades acts to force material from the tip of the cutter back toward the inlet orifice of the suction pipe that carries the material up to the dredge.

The claimed invention is an extension of the cutter head situated behind the suction pipe inlet orifice. The extension carries helical blades oriented in the direction opposite those on the cutter head. The blades on the extension act to direct back toward the intake orifice material which the cutter head has directed past the orifice. LaPorte alleges that the Cucheran invention has doubled the efficiency of its hydraulic dredges.

## I.

Cucheran invented and built his cutter extension in Canada in 1977. He successfully used it on dredges in Canada in 1977 and 1978. In 1978, a consulting engineer from Baltimore, Maryland, named Jantzen, of whom Cucheran was a client, photographed Cucheran's cutter extension. It is undisputed that Jantzen photographed the extension in Cucheran's presence, with his permission, and with no directions from him concerning confidentiality. In 1979, Jantzen gave a copy of the photograph to another of his customers, John MacDonald, the president of LaPorte. Jantzen told MacDonald of Cucheran's success with the extension and recommended that LaPorte use it on the LaPorte dredges. In November, 1980, MacDonald ordered a cutter extension from Jantzen, at a price of Jantzen's cost plus 15 percent, which was Jantzen's standard method of pricing where no design services were involved. Jantzen contracted with Ackerman & Baynes, Inc. of Baltimore for construction of the extension some time before November 25, 1980. Before initiating the project, Jantzen called Cucheran to let him know as a courtesy what Jantzen was doing and Cucheran said there was "no problem."

In early 1981, MacDonald began urging Jantzen to get Cucheran to seek a patent. An agreement was worked out in 1981 whereby Jantzen and LaPorte financed the preparation and prosecution of Cucheran's application. In return, Cucheran assigned LaPorte the patent rights for Virginia, North Carolina, South Carolina, Georgia and Florida, and gave Jantzen a one-third interest in the remaining rights. The application was filed on December 7, 1981.

Norfolk Dredging Company operates a commercial dredging business, primarily in Virginia, North Carolina, South Carolina, Georgia and Florida. In November, 1982, Norfolk Dredging hired Charles Gillikin as a consultant to work on improving the efficiency of one of its dredges. Gillikin was formerly LaPorte's dredging supervisor. While with LaPorte, he had seen and used the extension and had seen the photographs of the original Cucheran extension, and he recommended its installation on Norfolk's dredges. By January, 1983, Norfolk had ordered four extensions for its cutter heads from Gillikin. Norfolk Dredg-

---

A person shall be entitled to a patent unless (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States....

3. Although each of the two claims of the Cucheran patent is directed to a distinct invention, it is not disputed that both claims read on the extensions built by Cucheran in Canada in 1977 and 1978 and on the device allegedly sold before the critical date. For convenience, we will refer to the claimed inventions in the singular form.

ing does not contend that its cutter extensions are anything but the Cucheran invention.

The Cucheran patent issued February 15, 1983. Shortly thereafter LaPorte filed suit against Norfolk Dredging for patent infringement.

## II.

The district court held that the purchase arrangement between Jantzen and LaPorte in November, 1980, created an on-sale bar. The district court applied the test enunciated in *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 221 USPQ 561 (Fed.Cir.1984), stating that test as follows:

(1) that the invention was embodied in the machine offered for sale;

(2) that the invention was reduced to practice and operable [before November, 1980]; and

(3) that the invention was on sale for profit and not for experimentation.[4]

The court found that LaPorte's order met each of these requirements:

(1) that the Cucheran invention was fully embodied in the cutter cone constructed by Cucheran in 1977; that the sale in November 1980 was made from an actual photograph of that embodiment, in which all necessary details of this very simple device were fully disclosed. * * *

---

**4.** 625 F.Supp. at 39, 227 USPQ at 384. The court noted that the test was originally set forth in *Timely Products Corp. v. Arron*, 523 F.2d 288, 302, 187 USPQ 257, 267–68 (2d Cir.1975). However, in *Barmag*, 731 F.2d at 837, 221 USPQ at 565, we declined to adopt the *Timely Products* requirement for a physical embodiment of what is offered, stating:

It is not difficult to conceive of a situation where, because commercial benefits outside the allowed time have been great, the technical requisite of *Timely Products* for a physical embodiment, particularly for a simple product, would defeat the statutory policy and we, therefore, do not adopt the *Timely Products* test as the answer in all cases. However, since the district court concluded that the test was met, and we agree, we need not consider whether a less stringent standard might be appropriate in this case.

(2) that the Cucheran patent [sic, invention] was fully operable before the sale in November, 1980. It was successfully utilized on two occasions before November, 1980. Thus, it had been tested sufficiently to verify that it was commercially marketable; and

(3) that the cutter cone was on sale for profit in the transaction with LaPorte in November, 1980, and in no wise was such sale experimental. It is agreed that Jantzen made at least fifteen percent profit over the cost of the components and assembly labor. Reference is made to the holding in *General Electric Co. v. United States*, 654 F.2d 55, 59 [228 Ct.Cl. 192] (Ct.Cl.1981), wherein the CEC profit of 20–25 percent over costs of material and labor indicated to that court that the product was priced for sale and sold in a competitive market.

625 F.Supp. at 39–40, 227 USPQ at 384–85.

## III.

### *Issues*

1. Was there a sale between Jantzen and LaPorte?

2. Was there no on-sale bar because the invention was not disclosed to the public at the time of the sale?

## IV.

■ Although not stated *in haec verba*, the thrust of the district court's holding

Here, for the same reason as in *Barmag*, we need not consider whether a less stringent standard might be appropriate.

The district court also correctly modified the *Timely Products* formulation of the test to comport with Federal Circuit precedent. Although not expressly discussed in *Barmag* or any other of our cases discussing *Timely Products*, that case's statement of the first requirement, that "[t]he complete invention claimed must have been embodied in *or obvious in view of* the thing offered for sale" is contrary to *In re Foster*, 343 F.2d 980, 145 USPQ 166 (CCPA 1965), *cert. denied*, 383 U.S. 966, 86 S.Ct. 1270, 16 L.Ed.2d 307, 149 USPQ 906, *reh'g denied*, 384 U.S. 934, 86 S.Ct. 1441, 16 L.Ed.2d 535 (1966) and progeny. If obviousness is involved, the invalidity rests on § 103 based on § 102(b) prior art.

is that there was a sale, not merely an offer to sell, which created the § 102(b) bar.[5] Whether we consider that Jantzen's promotion of the Cucheran extension to his "best customer," LaPorte, was an offer of sale which LaPorte accepted by ordering the extension from Jantzen or that La-Porte's purchase order was an offer to buy which Jantzen accepted, either proposition results in a sale before the critical date. *See* U.C.C. § 2–206 (1962). Further, § 102(b) renders invalid a patent directed to an invention placed on sale in the United States more than one year before filing of the patent application. That bar is not limited to sales by the inventor or one under his control, but may result from activities of a third party. *Andrews v. Hovey*, 124 U.S. 694, 719, 8 S.Ct. 676, 686, 31 L.Ed. 557 (1888); *In re Caveney*, 761 F.2d 671, 676, 226 USPQ 1, 4 (Fed.Cir.1985); *Pennwalt Corp. v. Akzona, Inc.*, 740 F.2d 1573, 1580 n. 14, 222 USPQ 833, 837 n. 14 (Fed.Cir.1984); *General Electric Co. v. United States*, 654 F.2d 55, 61–62, 228 Ct.Cl. 192, 211 USPQ 867, 873 (1981). Nor does LaPorte disagree with that proposition of law. However, LaPorte argues that, if it had built the extension itself, there would be no on-sale bar and that having the device fabricated by another should have no different consequence. In LaPorte's view, Jantzen was simply La-Porte's agent to arrange for Ackerman & Baynes to make the extension for LaPorte. Under LaPorte's theory, there was no sale between Jantzen and LaPorte.

We must reject LaPorte's view of the facts. The district court found that LaPorte ordered the extension *from Jant-zen*. *See supra* note 5. As evidence in support of that finding, we note that La-Porte repeatedly says it was Jantzen's "best customer." Moreover, LaPorte's president testified that he ordered the extension *from Jantzen*. Finally, Ackerman & Baynes billed Jantzen, not LaPorte, and LaPorte paid Jantzen his normal fee of cost (as billed by Ackerman) plus 15%. In contrast, LaPorte points to no evidence that Jantzen was LaPorte's "agent" on this transaction any more than on any other. The finding that LaPorte ordered the extension *from* Jantzen is not clearly erroneous.[6] Thus, a sale of the patented invention occurred before the critical date.

## V.

Alternatively, LaPorte advances a theory that the sale in this case is not of the kind which gives rise to an on-sale bar as a matter of law.[7] Per LaPorte, while any commercial exploitation of an invention by an inventor (or his assigns) before the critical date works a forfeiture of his right to obtain a patent, in contrast, commercial exploitation by third parties does not work a forfeiture against the inventor unless the claimed invention is disclosed to the relevant "public" simultaneously with the sale.

In LaPorte's view, the only purpose of the third-party on-sale bar is to preclude the award of a patent to one who is not deemed an inventor because of prior art. To support this theory, LaPorte cites *CTS Corp. v. Piher International Corp.*, 527 F.2d 95, 102, 188 USPQ 419, 425 (7th Cir. 1975), *cert. denied*, 424 U.S. 978, 96 S.Ct. 1485, 47 L.Ed.2d 748, 189 USPQ 384 (1976), which contains the following statement:

> LaPorte and Jantzen's only joint effort, financing Cucheran's patent application, did not occur until months after LaPorte ordered the cutter extension from Jantzen. LaPorte's assertion is further belied by the district court's finding that LaPorte's order was not for experimental purposes, but rather was a commercial venture. LaPorte does not argue otherwise on appeal.

---

**5.** Specifically, the district court found that on "[a]bout November 4, 1980 MacDonald, president of LaPorte, contacted Jantzen and ordered the cone for LaPorte's use.... The purchase arrangement between LaPorte and Jantzen for the construction of the Cucheran cone occurred in November, 1980, and was on a cost plus percentage basis." 625 F.Supp. at 37, 227 USPQ at 383.

**6.** There is no evidence in support of LaPorte's argument that LaPorte and Jantzen were engaged in a joint effort to develop Cucheran's invention at the time of the purchase order.

**7.** Whether a particular activity raises the on-sale bar is a question of law. *Barmag*, 731 F.2d at 837, 221 USPQ at 565.

In [third-party on sale] cases, the statutory purpose is to preclude the award of a patent to a person who is not actually the inventor; proof that a product was on sale in the United States more than a year before the application date conclusively places that product in the category of prior art of which the inventor is presumed to have had knowledge.

From *CTS v. Piher*, LaPorte reasons that if a third party sale before the critical date informs the public of the claimed invention, the inventor is subjected to a "conclusive legal presumption" that the sold device is "prior art" to his invention under § 102(a). In effect, an inventor in this situation, under LaPorte's theory, is precluded from showing that he made his invention before the date of sale, but the invention must be disclosed to the relevant public by the sale date. A secret commercialization by a third party, per LaPorte, cannot have that effect. LaPorte finds support for a requirement that a third party sale must "disclose" the invention (in the sense of teaching one of ordinary skill in the art how to make it) in *W.L. Gore & Associates v. Garlock*, 721 F.2d 1540, 220 USPQ 303 (Fed.Cir.1983), *cert. denied*, — U.S. —, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984), in which this court held that an inventor was not barred from patenting a process simply because of another's sale of products made by that same process.[8]

While we agree with LaPorte that the purposes of the on-sale bar, in effect, define its terms, *Western Marine Electronics, Inc. v. Furuno Electric Co.*, 764 F.2d 840, 845, 226 USPQ 334, 337 (Fed.Cir.1985); *Barmag*, 731 F.2d at 836, 221 USPQ at 565, we do not agree that the sole purpose of that bar, when it is asserted against the inventor (or patent owner) based on acts of another, is "to preclude the award of a patent to one who is not the inventor."

*See, e.g., In re Caveney*, 761 F.2d at 676, 226 USPQ at 4. The *CTS* court was confronted with a situation involving two inventors who were engaged, *inter alia*, in an interference. In that context, the statutory purpose of § 102(b), stated in the opinion, may be apropos. In this case, we do not have two inventors, but one, and the purpose stated in *CTS* has no applicability here. In any event, however, the *CTS* court was not attempting to enunciate an exhaustive list of the statutory purposes of the on-sale bar.

With respect to *Gore v. Garlock*, that decision does not support the broad proposition that the "secret" commercialization of an invention by a third party creates no bar. As indicated, the question there was whether the process had been placed on sale by the third party's sale of a product made by the process. There had been no sale of the process *per se*, and the process was not discoverable from the product. Under those circumstances, the "secret" commercial use of the process by one did not raise the on-sale bar against the other. Contrary to LaPorte's argument, the *Gore* case has no applicability here for several reasons.

First, unlike *Gore*, the invention here was discoverable from the device which was sold. If LaPorte is arguing that, for purposes of the statutory bar, the sale should be deemed to have occurred no earlier than the delivery date of the device (which is after the critical date), that argument is contrary to our precedent and is again rejected. To hold otherwise would mean adding a requirement that goods be "on hand" and transferred at the time of the sale to invoke the bar, a requirement specifically rejected by this court. *Barmag*, 731 F.2d at 836, 221 USPQ at 565.

**8.** In LaPorte's own words, its theory is as follows:

If the inventor is presumed to have knowledge, then the relevant public has knowledge because the invention is in the public domain. If the action does not inform the relevant public, there is no reason for imputing knowledge to the inventor. For this reason, only sales by a third party which inform the relevant public have been held within the "on sale" bar of 35 U.S.C. § 102(b).

LaPorte sees the § 102(b) on-sale bar based on activities of a third party as a species of the § 102(a) prohibition against patenting an invention known to the public before the date of invention.

The date of the purchase agreement is, therefore, the effective date on which the invention became part of the public domain. That delivery of the device embodying the invention occurred later is immaterial.[9]

■ Secondly, our precedent holds that the question is not whether the sale, even a third party sale, "discloses" the invention at the time of the sale, but whether the sale relates to a device that *embodies* the invention. *King Instrument Corp. v. Otari Corp.*, 767 F.2d 853, 860, 226 USPQ 402, 407 (Fed.Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1197, 89 L.Ed.2d 312 (1986); *Barmag*, 731 F.2d at 838, 221 USPQ at 566. The fact that the device here was made from photographs of the inventor's own embodiment of his invention eliminates any question that the subject of the sale and the claimed subject matter of the patent were one and the same.

■ Finally, LaPorte ignores the fact that LaPorte itself was a member of the relevant public at the time of the sale. Its later acquisition of rights in the patent does not retroactively change its status at that time.

■ With respect to the inventor Cucheran, he cannot be viewed as a wholly innocent victim here. Cucheran placed the means of commercializing his invention in the hands of Jantzen, expressed no objection to Jantzen's sale of a device embodying the invention to LaPorte, and, shortly after that sale, entered into an arrangement with Jantzen and LaPorte to patent his invention. Cucheran's conduct violates one of the principal policies of § 102(b) which is to encourage early filing. *See General Electric*, 654 F.2d at 61, 211 USPQ at 873. On these facts we see no reason to consider making an exception to the general rule that a third-party sale of a device embodying the claimed invention prior to the critical date invalidates the patent under § 102(b). *In re Caveney, supra.*

## VI.

The judgment of the district court that claims 1 and 2 of U.S. Patent No. 4,373,277 are invalid is affirmed. Norfolk's request for damages pursuant to Fed.R.App.P. 38 is denied.

AFFIRMED.

---

9. The district court here found that "all necessary details of this very simple device were fully disclosed" by the photographs. 625 F.Supp. at 39, 227 USPQ at 384. Thus, LaPorte had complete knowledge of the invention even before the sale.