**SEALMASTER, L.L.C., Plaintiff**

v.

**SILVER LINE BUILDING PRODUCTS and Home Depot USA, Inc., Defendants**

No. 3:99–CV–279.

United States District Court,
E.D. Tennessee,
at Knoxville.

Jan. 10, 2001.

Order Denying Reconsideration
May 22, 2001.

William F Shumate, Jr, Shumate & Bowling, Knoxville, TN, for Sealmaster, LLC, plaintiff.

Arnold H Krumholz, William L Mentlik, Lerner, David, Littenberg, Krumholz & Mentlik, Westfield, NJ, for Home Depot USA, Inc., defendant.

Bradley H Hodge, Gentry, Tipton, Kizer & McLemore, PC, Knoxville, TN, Andrew R Tillman, Paine, Tarwater, Bickers & Tillman, Knoxville, TN, Arnold H Krumholz, William L Mentlik, Lerner, David, Littenberg, Krumholz & Mentlik, Westfield, NJ, for Silverline Building Products.

William F. Shumate, Jr., Shumate & Bowling, Knoxville, TN, Bruce Tittel, Gregory J Lunn, Wood, Herron & Evans, LLP, Cincinnati, OH, Curtis L Cornett, Robert J Hollingsworth, Cors & Bassett, Cincinnati, OH, for Sealmaster, LLC, defendant.

## MEMORANDUM OPINION

JARVIS, District Judge.

Plaintiff, SealMaster, L.L.C. (SealMaster), a vinyl window manufacturer based in Rockwood, Tennessee, brings this patent infringement action against a New Jersey corporation, Silver Line Building Products Corporation (Silver Line), another window manufacturer whose primary product is vinyl windows, and against Home Depot USA, Inc., one of Silver Line's largest customers. SealMaster alleges that the defendants have infringed U.S. Patents Nos. 5,392,574 (the '574 patent) and 5,660,010 (the '010 patent), both entitled "Window Frame for Manufactured Housing." [See Doc. 1, Exs. 1 and 2, respectively]. Leland D. Sayers of Knoxville, Tennessee, is the inventor listed on both patents. Essentially, these two patents claim a window having a window frame and a J-rail integrally formed with that frame. According to SealMaster, this construction allows a window frame to be installed as a unit in an opening of a building with minimal labor.

This matter is presently before the court on defendants' motion for summary judgment [Doc. 12] in which defendants contend that the asserted claims of the '574 and '010 patents are invalid under 35 U.S.C. § 102(b)[1] because the subject matter of those claims was in public use in the United States more than a year before the filing date of these two patents. Defen-

1. Specifically, 35 U.S.C. § 102(b) provides as follows:

A person shall be entitled to a patent unless—

 (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States.

dants' argument is two-fold. First, defendants contend that the prior sale of windows with the claimed invention by Silver Line invalidates these patents. Second, defendants contend that the prior sale of windows with the claimed invention by SealMaster itself invalidates these patents. The issues raised have been exceptionally well briefed by the parties [*see* Docs. 19, 22, 23, 24, and 25], and oral argument was heard on May 22, 2000. For the reasons that follow, defendants' motion will be partially granted, the court concluding that there is no genuine issue of material fact that Silver Line manufactured and sold windows in the United States having every feature later claimed as an invention by SealMaster for years—if not decades—prior to August 10, 1987, the date of the earliest possible patent application.[2] However, the court will reserve ruling on that prong of defendants' motion addressing Claim 2 of the '010 Patent pending further briefing by the parties.

## I.

The '574 and '010 patents collectively have several independent and dependent claims.[3] The claims of both patents define a window frame with an integral J-rail,[4] all of which is adapted to be mounted to an opening in a window. That J-rail is defined in Claim 1 of the '010 patent as follows:

> . . . J-rail return member integrally formed with said window frame body member so as to extend outward from said window frame body member when said window frame body member is received in the opening, said J-rail return member having
>
> a) a flange portion for extending radially around the opening and for attachment of said window frame to the structure,
>
> b) a projecting portion extending away from said flange portion in a direction perpendicular to said flange portion, and
>
> c) a return portion having a proximate edge and a distal edge, said proximate edge being connected to an outermost extent of said projecting portion, said return portion being substantially parallel with said flange portion to define a substantially rectangularly shaped slot between said return portion and said flange portion, said slot having an opening at said distal edge of said return portion for accepting siding to be attached to the outer wall of the structure, said return portion having a width to cover the siding even during any contraction of the siding, whereby said window frame can be installed as a unit within the opening of the structure with minimal labor to receive at least one window and the siding in a secure manner.

[*See* Doc. 1, Ex. 2, pp. 6–7]. A J-rail is similarly defined in Claim 1 of the '574 patent [*see id.*, Ex. 1, p. 7]. Thus, the term

---

2. Therefore, the court need not address the more complicated issues raised by that prong of defendants' motion addressing whether SealMaster itself sold window frames having the features claimed in the '574 and '010 patents more than a year prior to the date of the applicable patent applications.

3. Claim 1 of the '574 patent and claims 1 and 5 of the '010 patent are the independent claims. Claims 3 and 6 of the '010 patent depend directly from independent claims 1 and 5. Because the parties did not separately argue the patentability of the dependent claims, the dependent claims therefore "stand or fall" together with the independent claims. *See Finnigan Corp. v. International Trade Com'n.*, 180 F.3d 1354, 1365 n. 7 ("The parties do not separately argue the validity of dependent claims 2–4. These claims therefore stand or fall together with independent claim 1.").

4. The J-rail is also referred to by some in the window industry as a J-channel [*see, e.g.*, Doc. 15, Ex. A].

J-rail is defined in its claims quite specifically as having three members: (1) a "flange portion"; (2) a "projecting portion"; and (3) a "return portion."

According to Kendall Sayers, the Chief Manager of SealMaster, L.L.C.,[5] and president of SealMaster Industries, Inc., the integral J-rail feature is the patented invention being asserted against the defendants [*see* Doc. 20, attachment]. An integral J-rail is simply a J-rail that is extruded as part of the window frame. Consequently, when the siding is installed, there is no need to use a separate J-rail to hide the siding edges.

In engineering drawings, a J-rail is typically viewed in a cross section. Not surprisingly, that is also the manner in which the J-rail is depicted in both of SealMaster's patents, reproduced as follows:

5. SealMaster, L.L.C., is the current owner of the patents in suit [*see* Doc. 20, p. 2, n. 2]. Kendall Sayers is the son of Leland Sayers, the inventor listed on both patents.

Again, as is readily apparent from the above patent drawings, and as set forth in SealMaster's claims, a J-rail has three structural components: (1) a nailing flange (numbered as 54 in SealMaster's patent drawings); (2) a projecting portion (numbered as 58); and (3) a return portion (numbered as 62).[6]

### A.

In support of its position that the defendants have infringed these two patents, SealMaster relies exclusively on a drawing in a brochure distributed by defendants [*see* Doc. 1, Ex. 3]. According to SealMaster, that brochure accurately depicts a cross section of a window frame that has been sold by defendants in this judicial district and elsewhere [*see* Doc. 1, Ex. 3]. The drawing in that brochure is set forth below: [7]

---

**6.** The court would note that the "C" shaped portion (numbered as 84) is a cross section of a "screw boss," which is a semi-cylindrical bore in the sill and header that allows for attachment to the jams, thereby making up the window frame unit. According to Arthur Silverman, the founder of Silver Line, the screw bosses "have no effect on the structure or function of the J-rail." [*See* Doc. 15, p. 10, ¶ 29].

**7.** The numbers and their defining parts on the drawing have been added.

12 Wall
36 Window frame
36A Header
37 Sill
38 Opening
44 Body member
46 J-rail Return Member
52 Inner wall
53 Outer wall
54 Flange Portion
58 Projecting Portion
60 Siding
62 Return Portion
64 Raised bead
65 Proximate edge
67 Distal edge
69 Slot
69 Slot
71 Opening
96 Window

SealMaster's comparison of the claim elements to defendants' window is essentially as follows:

A projecting portion 58 extending away from flange portion 54 in a direction perpendicular thereto, and a J-rail return member 46 connecting to the projecting portion 58, which together provide a substantially rectangular-shaped slot 69 with a width sufficient to cover siding during any contraction of the siding.

B.

In support of their position that each and every element of the claimed invention is contained in the invalidating prior art, defendants rely heavily on the declaration of Arthur Silverman, Silver Line's founder [*see* Doc. 15]. In his declaration, Mr. Sil-

verman first explains the historical background of the types of windows at issue in this litigation. Mr. Silverman then describes how, beginning in the late 1960s:

> ... Silver Line realized that its windows were being installed in homes that had siding of aluminum or manufactured shingle, and there needed to be a system to hide the rough edges of these materials.
>
> 35. Silver Line found that the simplest, cheapest and most obvious way to hide the edge of the siding was with an integral J-rail. Thus, Silver Line modified its jam, sill and header extrusion to add an integral J-rail to the nailing flange. Silver Line manufactured and sold windows with such integral J-rails at least as early as the early 1970s.
>
> 36. At least since the early 1970s, Silver Line sold a number of windows that incorporated such an integral J-rail. Each of these windows were [sic] sold with an integral J-rail that was deep enough to accommodate various types of siding and wide enough to allow for the expansion and construction of the siding without exposing its ends.

[See Doc. 15, pp. 11–12, ¶ 34–36]. Mr. Silverman next lists five different types of windows which incorporated that integral J-rail feature [see id., p. 12, ¶ 36]. However, Mr. Silverman only discusses and analyzes features of the Series 1000 Awning Window (the ATW[8] 1000) and the Series 6100 Picture Window for purposes of the pending motion. During argument, the defendants focused only upon the similarities between the ATW 1000 window and the patents-in-suit and utilized a mock-up of that window for demonstrative purposes. Because the court finds that the ATW 1000 window anticipates SealMaster's present claims, the court will only discuss that window.

The ATW 1000 window is an aluminum framed window that pivots open from the bottom. In the mock-up, a stud wall with an opening for a window was first covered with sheathing. The window was then installed into the opening as is done in typical new frame construction—by nailing or screwing through the nailing flange, through the sheathing, and into the studs.

Mr. Silverman testifies that the mock-up of the awning window is installed exactly the way the ATW 1000 was designed to be installed, and in the way that the ATW 1000 was installed in homes through the Eastern United States in the 1970s [see id., p. 14, ¶ 43]. Mr. Silverman testifies further that, "[t]he frame extrusions leave a continuous J-rail channel around the window opening so that when siding was placed over the sheathing the ends of the siding were covered." [See id.].

In support of his position, Mr. Silverman points to Silver Line's old catalogues and engineering drawings, dated prior to August 10, 1987,[9] regarding the ATW 1000. For example, one of Silver Line's brochures from the 1970s shows the ATW 1000 [see id., Ex. B]. Mr. Silverman also relies on documentation reflecting prices and sizes for the ATW 1000 [see id., pp. 00153–00162]. Additionally, Mr. Silverman relies on a color brochure for the ATW 1000 which lists awning windows "with or without integral fin trim." [See id., Ex. C]. Mr. Silverman then testifies that, "[t]he windows with the 'fin trim' were those that incorporated a J-rail." [See id., p. 16, ¶ 48]. Mr. Silverman relies further on drawings in the catalogues which show the integral J-rail feature in a general view [see id., Ex. C, p. 2].

An even more detailed depiction is set forth in Silver Line's engineering draw-

---

8. ATW is an acronym for "Awning Type Window."

9. Again, this is the earliest possible date on which SealMaster filed a patent application.

ings. Mr. Silverman testifies that he located the engineering drawings of the ATW 1000, each of which is almost 30 years old [*see id.*, p. 17, ¶ 51]. Set forth below is an enlargement of a portion of an engineering drawing dated December 7, 1971, for the jamb of an ATW 1000:

According to Mr. Silverman, the above extrusion has a "integral J-rail, comprising a nailing flange (the long vertical line on the right), a projecting portion (the horizontal line at the bottom), and a return portion (the short vertical line on the left), thus creating a slot for the insertion of siding." [*See id.*, p. 18, ¶ 53].

Mr. Silverman's declaration next sets forth the ATW 1000 header J-rail as follows:

The following drawing represents the ATW 1000 sill J-rail:

Mr. Silverman then testifies as follows regarding the above engineering drawings:

These engineering drawings show that the jamb, sill, and header extrusions for a Series 1000 Awning Window, which was engineered in 1971 and manufactured and sold in the eastern United States throughout the 1970s and early 1980s, contained a J-rail for the insertion of siding. Importantly, as shown in each extrusion, the J-rail had a flange, a projecting portion and a return portion, which were respectively an integral part of the jamb, an integral part of the header, and an integral part of the sill extrusion, thus making an *integral* J-rail.

[*See id.*, p. 20, ¶ 56 (emphasis in original) ].

Mr. Silverman next testifies that actual windows incorporating the J-rail were sold by Silver Line prior to August 10, 1986 [10] [*see id.*, p. 21, ¶ 57]. Mr. Silverman specifically testifies that he contacted both distributors to whom Silver Line sold windows and home owners who had Silver Line's windows installed in their homes prior to August 10, 1986 [*see id.*, pp. 21–22, ¶¶ 58–61]. One of the homeowners provides some of the most significant testimony in this regard. Sara Gellerstein testifies that she purchased her home on June 2, 1971, in the Township of Berkeley, New Jersey, and that the windows and siding of her home are original and have not been replaced [*see* Doc. 14]. The corroborating declaration of James J. Bitz, a product engineer for Silver Line, confirms that Ms. Gellerstein's "awning" window is an ATW 1000 window and that it incorporates the "integral J-rail into which the siding is fit." [*See* Doc. 13, p. 3, ¶ 7].

The most compelling testimony in support of this prong of defendants' motion is the detailed analysis by Mr. Silverman regarding each and every element of Claim 1 of the '574 patent and Claims 1 and 5 of the '010 patent,[11] and how every limitation

**10.** The court assumes that Mr. Silverman meant 1987 as opposed to 1986 since August 10, 1987, is the date of the earliest possible patent application by SealMaster. Either way, the court's analysis is the same.

**11.** Thus, Mr. Silverman has analyzed each element of SealMaster's independent claims.

of these claims, which are alleged to read on Silver Line's current commercial window, reads directly on the prior art. Mr. Silverman's analysis is set forth in the claim chart attached to defendants' original brief [*see* Doc. 19, Ex. A][12] and is further illustrated by the pictures (accompanied by similar analysis) attached to defendants' reply brief [*see* Doc. 23, Ex. A].

### C.

In response to this proof, SealMaster does not dispute the fact that these ATW 1000 windows were sold prior to August 10, 1987. Nor does SealMaster dispute the fact that these ATW 1000 windows were sold many years prior to the date of SealMaster's earliest patent applications regarding the '574 patent and the '010 patent. SealMaster does, however, vigorously dispute defendants' contention that these ATW 1000 windows incorporate integral J-rails. In support of its position, SealMaster relies on the declaration of Kendall Sayers and Timothy Jones. Mr. Sayers testifies generally that the ATW 1000 windows do not incorporate an integral J-rail [*see* Doc. 20, attachment].

Mr. Jones' testimony contributes considerable detail supporting SealMaster's position regarding this window. Mr. Jones testifies from the vantage point of one who has been employed in the window industry for more than 20 years, employed by SealMaster, Inc., from 1986 to 1992 and employed by SealMaster Industries, Inc., as general manager from 1992 to the present [*see* Doc. 20, attachment, p. 1–2].[13] Mr. Jones testifies that SealMaster's J-rail has the following features: (1) that it directs water away from the window and permits no leakage; (2) that it cannot have holes;

(3) that the holes cannot have screws; (4) that the J-rail windows must now be installed without trim and caulk; and (5) that, in addition to having flange portions extending radially around the window opening, the corners of the window must be covered. Mr. Jones testifies further that he has examined the mock-up ATW 1000 window, concluding that the ATW 1000 window does not have an integral J-rail because of the above differences.

### III.

It is well settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, *i.e.*, the patent itself, including the claims, specifications, and, if in evidence, the prosecution history. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979, 34 USPQ2d 1321, 1329 (Fed.Cir.1995) (en banc), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). "Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." *Vitronics Corporation v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed.Cir.1996). As discussed by the court in *Vitronics:*

> In most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term. In such circumstances, it is improper to rely on extrinsic evidence.... In those cases where the public record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper. The claims, specifications, and file history, rather than extrinsic evidence, constitute the public record of the patentee's claim, a record

---

**12.** Again, the court is not considering that portion of Mr. Silverman's claim chart which pertains to the Series 6100 picture window.

**13.** Mr. Jones has also been operating his own business utilizing the name Preservation Windows in Knoxville, Tennessee, from 1986 to the present [*see* Doc. 20, attachment, p. 2, ¶ 6].

on which the public is entitled to rely. In other words, competitors are entitled to review the public record, apply the established rules of claim construction, ascertain the scope of the patentee's claimed invention and, thus, design around the claimed invention. Allowing the public record to be altered or changed by extrinsic evidence introduced at trial, such as expert testimony, would make this right meaningless.

*Id.* at 1583 (citations and parenthetical information omitted). Furthermore, while the court may utilize extrinsic evidence to understand the patent, the court may not use it to vary or contradict the terms of the claims. *See Markman,* 52 F.3d at 981. *See also Cortland Line Co., Inc. v. Orvis Co., Inc.,* 203 F.3d 1351, 1356 (Fed.Cir. 2000) ("Although the central focus remains on the claim language as illuminated by the written description and the prosecution history, extrinsic evidence may supply context to understand the claim language.").

Here, SealMaster is attempting to resolve the instant dispute by improperly introducing extrinsic evidence through Mr. Jones' testimony. And it is improper because there does not appear to the court to be any arguable ambiguity in the words of the claims themselves. SealMaster chose to specifically define the term J-rail in its claims by means of three distinct structural components: a flange portion, a projecting portion, and a return portion. SealMaster, through Mr. Jones' declaration, *now attempts to graft entirely new limitations onto these claims*—limitations which do not even appear in the specifications. As previously noted, Mr. Jones now testifies that the term J-rail directs water away from the window and permits no liquid; that it cannot have holes; that the holes cannot have screws; that the J-rail windows must now be installed without trim and caulk; and that, in addition to having flange portions extending radially around the window opening, the corners of the window must be covered. But this language is not set forth in the claims of the patents-in-suit. Mr. Jones is simply attempting to assign new meaning to the term "J-rail."

Furthermore, some of Mr. Jones' testimony is actually inconsistent with the claim language. For example, Mr. Jones testifies that "J-rails cannot include holes through them into the inside of the window." [*See* Doc. 20, attachment, p. 5, ¶ 18]. Yet, Figure 4 of the patents-in-suit indicate that the J-rail return 46 is specifically shown to include openings 112 through which screws 110 are applied for attaching the header and jamb portions to each other. Likewise, in column 5, lines 1–5 of the '574 patent, in reference to Figure 2, the J-rail portion of SealMaster's preferred embodiment includes a flange member 54 that is attached to the window with nails or screws 56. Thus, the court agrees with the defendants that if one were to construe SealMaster's claims as suggested by Mr. Jones, they would not even cover SealMaster's own preferred embodiment. *See Modine Manufacturing Company v. United States International Trade Commission,* 75 F.3d 1545, 1551 (Fed.Cir.1996) ("[W]hen the preferred embodiment is described in the specification as the invention itself, the claims are not necessarily entitled to a scope broader than that embodiment."). Consequently, the court agrees with defendants that SealMaster cannot utilize the declaration of Mr. Jones in order to rewrite its claims and therefore redefine its J-rail.

## IV.

Under 35 U.S.C. § 102(b), patent claims are invalid, among other things, if the subject matter was in "public use" in the United States for more than a year before the filing date. This public use bar "serves the policies of the patent system,

for it encourages prompt filing of patent applications after inventions have been completed and publicly used, and sets an outer limit to the term of exclusivity." *Allied Colloids Inc. v. American Cyanamid Company,* 64 F.3d 1570, 1574 (Fed.Cir. 1995). The requirements of the public use bar of § 102(b) are two-fold: (1) the completed invention must be used in public; and (2) the use must not be primarily experimental in purpose. *Id.* Here, Seal-Master does not contend that the use of the ATW 1000 window was experimental nor does SealMaster argue that this window was not used in public. Rather, Seal-Master primarily contends that the ATW 1000 window did not have an integral J-rail and it is for that reason that there was no public use.

■ In discussing the concept of public use, the law has long been established that:

> ... it is not necessary that more than one of the patented articles should be publicly used. The use of a great number may tend to strengthen the proof, but one well-defined case of such use is just as effectual to annul the patent as many.

*Egbert v. Lippmann,* 104 U.S. (14 Otto) 333, 336, 26 L.Ed. 755 (1881) (citations omitted). *See also Electric Storage Battery Company v. Shimadzu,* 307 U.S. 5, 20, 59 S.Ct. 675, 83 L.Ed. 1071 (1939) ("single use" of product for profit sufficient to invalidate); *Minnesota Mining and Manufacturing Company v. Kent Industries, Inc.,* 409 F.2d 99, 100 (6th Cir.1969) ("It is settled law that a single public use ... is sufficient to invalidate a patent under 35 U.S.C. § 102(b).").

■ Additionally, "whether the use of an invention is public or private does not necessarily depend upon the number of persons to whom its use is known." *Egbert,* 104 U.S. at 336, 14 Otto 333. The Court in *Egbert* explained further that,

"[i]f an inventor, having made his device, gives or sells it to another, to be used by the donee or vendee, without limitation or restriction, or injunction of secrecy, and it is so used, such use is public, even though the use and knowledge of the use may be confined to one person." *Id.*

■ Also under § 102(b), a patent claim is invalid if the subject matter of the claim was "on sale" in the United States more than a year before the effective filing date. Like the "public use" bar, the "on sale" bar "encourages early disclosure and prevents extension of the statutory patent term." *Intel Corporation v. U.S. International Trade Commission,* 946 F.2d 821, 830 (Fed.Cir.1991) (citation omitted). In order to trigger the "on sale" bar, no actual sale is necessary—an offer to sell is sufficient. *See, e.g., King Instrument Corporation v. Otari Corporation,* 767 F.2d 853, 860 (Fed.Cir.1985). Consistent with the "public use" bar, a single sale or offer for sale is enough to trigger the "on sale" bar. *Intel Corporation,* 946 F.2d at 830. Furthermore, the "on sale" bar is not limited to sales by the future patentee, *i.e.,* SealMaster; rather, the doctrine applies with equal force when the invention is placed "on sale" by a third party, *i.e.,* Silver Line. *See J.A. LaPorte, Inc. v. Norfolk Dredging Company,* 787 F.2d 1577, 1581 (Fed.Cir.1986) (citations omitted).

■ The law is also well established that there is no requirement that a sales offer specifically identify all of the characteristics of an invention offered for sale or that the parties recognize the significance of all of these characteristics at the time of the offer. *See Scaltech Inc. v. Retec/Tetra, L.L.C.,* 178 F.3d 1378, 1383–84 (Fed.Cir. 1999). "If a product that is offered for sale inherently possesses each of the limitations of the claims, then the invention is on sale, whether or not the parties to the transaction recognize that the product pos-

sesses the claimed characteristics." *Abbott Laboratories v. Geneva Pharmaceuticals,* 182 F.3d 1315, 1319 (Fed.Cir.1999) (citations omitted). It is for that reason that this court is not concerned that Silver Line did not use the term "J-rail" in its literature describing the ATW 1000 window. The critical inquiry is whether the then so-called fin rail possessed the same characteristics as did SealMaster's J-rail. And, as previously discussed, it did.

 Finally, patent invalidity based on public use is required to be proved by clear and convincing evidence. *Moleculon Research Corporation v. CBS, Inc.,* 793 F.2d 1261, 1266, 229 USPQ 805, 808 (Fed. Cir.1986), *cert. denied,* 479 U.S. 1030, 107 S.Ct. 875, 93 L.Ed.2d 829 (1987). Similarly, patent invalidity based on the on sale bar is required to be proved by clear and convincing evidence. *Intel Corporation,* 946 F.2d at 830. "Clear and convincing evidence has been described as evidence which proves in the mind of the trier of fact an abiding conviction that the truth of [the] factual contentions are [sic] highly probable." *Id.* (internal quotations and citations omitted). "The 'clear and convincing' standard of proof of facts is an intermediate standard which lies somewhere between 'beyond a reasonable doubt' and a 'preponderance of the evidence.'" *Buildex Inc. v. Kason Industries, Inc.,* 849 F.2d 1461, 1463 (Fed.Cir.1988) (internal quotations and citations omitted).

 Against this legal background, the court concludes that the defendants have proven, by clear and convincing evidence, that the ATW 1000 window, which embodies each element of what SealMaster later

claimed in the '574 and the '010 patents (with the exception of Claim 2 of the '010 patent) was placed "on sale" in the United States by Silver Line well more than a year before the earliest possible filing date of August 10, 1987. In fact, the proof in this case indicates that the ATW 1000 windows were sold in commercially significant quantities. Furthermore, once the ATW 1000 windows were installed, they were in "public use." Again, the real question in this case is not whether the ATW 1000 window was placed "on sale" or was in "public use." The more difficult question is whether that window embodies each element of what SealMaster later claims in its '574 and '010 patents. For the reasons previously enunciated, the court holds that it does.

The only remaining limitation in any of the claims of the patents-in-suit which is not included in the earliest Silver Line product is found in Claim 2 of the '010 patent. In view of the early dates of the ATW 1000 windows, these windows were comprised of metal and were not constructed of vinyl. Because of this limitation, the court will not address this claim but will allow defendants to further brief this issue, most likely asserting obviousness under 35 U.S.C. § 103, in a subsequent motion for summary judgment as indicated in their brief [*see* Doc. 23, p. 25].[14]

Order accordingly.

### MEMORANDUM AND ORDER

After carefully reviewing the outstanding briefs filed by the parties [*see* Docs. 45,

---

14. The court recognizes that whether Claim 2 of the '010 patent was anticipated by Silver Line's early products has no bearing on the separate question of whether Claim 2 of this patent was anticipated by SealMaster's own admitted sales more than a year before its true 1992 effective filing date. However, because of the complexities of the issues raised in that prong of defendants' motion, the court will reserve ruling on that issue, if necessary, until after SealMaster files its anticipated motion for summary judgment regarding Claim 2 of the '010 patent relating to obviousness under 35 U.S.C. § 103.

50, 51, and 58], plaintiff's motion for reconsideration [Doc. 45] is hereby DENIED. While the court does not intend to address all issues raised by plaintiff in its motion, primarily because much of this is a rehash of the issues previously raised and briefed, the court will make a couple of observations.

■ First, the principal impetus for the pending motion is a case decided by the Federal Circuit, *AFG Industries, Inc. v. Cardinal IG Co., Inc.*, 239 F.3d 1239 (Fed.Cir.2001), approximately a month after this court entered its January 10th memorandum opinion and order. Plaintiff's reliance on *AFG Industries* is misplaced because the facts of that case are easily distinguishable from the instant case. In *AFG Industries*, the appellate court explained that the "trial court noted that the patentee did not set forth an explicit definition of 'layer' in the patent . . . ." 239 F.3d at 1247. Thus, the district court was allowed, if not required, to consider extrinsic evidence to ascertain how persons of ordinary skill in the art would interpret that term as well as the term "interlayer." *Id.* at 1248. Here, by contrast, plaintiff did set forth an unambiguous and explicit definition of "J-rail" in its specification and again in its patent claims.

> A technical term used in a patent document is interpreted as having the meaning that it would be given by persons experienced in the field of the invention, *unless it is apparent from the patent and the prosecution history that the inventor used the term with a different meaning.*

*Hoechst Celanese Corp. v. BP Chemicals, Ltd.*, 78 F.3d 1575, 1578 (Fed.Cir.1996) (emphasis added) (citations omitted). *See also Johnson Worldwide Associates, Inc. v. Zebco Corporation*, 175 F.3d 985, 990 (Fed.Cir.1999) (where "the patentee has chosen to be his or her own lexicographer by clearly setting forth an explicit definition for a claim term[,]" this "require[s] the entry of a definition of a claim term other than its ordinary and accustomed meaning."). It follows therefore that an "ordinary and accustomed meaning" becomes an issue if—and only if—the patentee has failed to provide a specific definition. Because plaintiff has chosen to provide a clear and specific definition of "J-rail" in the claims at issue, the court concludes, once again, that plaintiff cannot utilize extrinsic evidence in the form of the declaration of Timothy Jones regarding the ordinary and accustomed meaning of that term.

■ Second, even if the court were to consider Mr. Jones' declaration, this additional proof would not create a legitimate factual issue with respect to plaintiff's purported claim construction. Plaintiff, through Mr. Jones' declaration, asserts that the term "J-rail" has a specific meaning to one of ordinary skill in the art, which meaning includes a requirement that there be no holes through which water can leak into or around the window or door. However, during oral argument, the defendants asserted that the thousands of ATW 1000 windows sold by it prior to the plaintiff's application did not leak.[1] In support of their position, defendants relied on documentation of the 1962 official qualification of the ATW 1000 windows' waterproof nature. In fact, the court was able to observe from its inspection of the mock-up of that window that the insertion and riveting of tabs into slots during construction did

---

1. Defendants have correctly pointed out that this court inadvertently stated that the ATW 1000 windows were sold prior to August 10, 1987, as opposed to August 10, 1986 [*see* Doc. 41, p. 15]. Therefore, pursuant to Fed.R.Civ.P. 60(a), the court hereby AMENDS its memorandum opinion to reflect that correction to this typographical error at that location and any other location in that opinion.

not result in any leakage. It simply stands to reason that defendant Silver Line Building Products, Inc., would not have designed a window displaying the type of leakage which plaintiff now ascribes to those windows. More importantly, there is no proof in this record that the ATW 1000 window leaked. Moreover, it appears to the court that even if the riveted holes of Silver Line's window did leak, the water would run down the inside of the channel and out into the environment. It would not enter the house. Thus, the court agrees with the defendants that even if the claims were improperly rewritten to require that the windows be waterproof, plaintiff has not rebutted defendants' proof that the ATW 1000 window failed to meet this purported limitation.

For these reasons, and for every other reasons articulated by defendants in their initial reply brief [*see* Doc. 50], the court is constrained to abide by its previous ruling, with all due respect to plaintiff.